IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| K.S., Parent, on Behalf of her Minor son R.S., Philadelphia, PA | : |
| | : |
| | : Civil Action |
| *vs.* | : |
| | : No: |
| The School District of Philadelphia | : |
| | : |
| and | : |
| | : |
| The Philadelphia School Reform Commission 2130 Arch Street, 5th Floor, Philadelphia, PA 19103 | : |
| | : |
| | : Jury Trial Demanded |
| and | : |
| | : |
| Paul G. Vallas, Chief Executive Officer of the School District of Philadelphia | : |
| | : |
| and | : |
| | : |
| David Hornbeck, Former Superintendent of the School District of Philadelphia | : |
| | : |
| Individual Defendants as employees of the School District of Philadelphia, in their official and individual capacities. | : |
| | : |

**COMPLAINT-CIVIL ACTION**

Plaintiff, R.S., by his parent K. S. by way of Complaint says:

1

**INTRODUCTION**

1.      This is a civil rights action brought on behalf of R.S. and his parent K.S. under the Equal Protection Clause of the Fourteenth Amendment to the Constitution, the Civil Rights Act of 1871, 42 U. S. C. § 1983; the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et. seq*.; section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"); the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 (the "ADA") and Pennsylvania's implementing statutes and regulations with respect to the above federal laws, against the Philadelphia School District (the "School District"), the Philadelphia School Reform Commission ("PSRC") and certain of its named current and former employees for compensatory and punitive damages (against the individual defendants) for violations of the laws that protect the constitutional and statutory rights of individuals with disabilities to a free appropriate public education and their right to be free from discrimination based upon their disability.

2.      R.S., the subject of this Complaint, is a seventeen-year-old young man of average intellectual potential who suffers from severe learning and emotional disabilities as those terms are defined by Part B of the federal regulations governing implementation of the Individuals with Disabilities Education Act, 34 CFR §300.7.  During the 2004 –2005 school year, R.S. attended a specialized school for learning and emotionally disabled students, where, for the first time since he was a very young child, he made meaningful

academic progress.  Prior to the 2004-2005 school year and from the age of six, R.S. attended Philadelphia Public Schools, where the School District and the individual defendants knowingly and either intentionally or with deliberate indifference, withheld from him the individualized instruction and services he required in order to make meaningful progress in school.

3.     As a consequence of the failure of the School District and the individual defendants to program appropriately for R.S. during the ten year period of the 1994-1995 through the 2003-2004 school years, R.S. failed to acquire anything beyond the most rudimentary skills in all of the major academic skill areas, including reading, writing and math.  R.S. cannot read a newspaper or high school text book.  He can write only the most basic phrases using simple words that he will typically misspell.  Often, the quality of his written work is so poor that his intent is difficult to discern.  His knowledge of written grammar is similarly rudimentary.  A stranger reading something that he has authored, knowing nothing of the writer, would reasonably believe R.S. to be a child of perhaps six years old.

4.     R.S. has always possessed the intelligence needed to learn to read, write and perform math functions at an age appropriate level.  He has been unsuccessful primarily for two reasons.  First, the School District of Philadelphia has failed to provide him with an appropriately individualized program of instruction.  For example, there have existed for several years (and at all times relevant to this Complaint) research-based, proven methods for teaching learning disabled students such as R.S. to read and write.  The School District has never

3

provided R.S. with such instruction.  Moreover, the annual Individualized

Educational Programs ("IEPs") written for R.S. by the School District year after

year, were without exception so deficient in their design and execution, that R.S.

would not have been expected to make meaningful academic progress in school,

irrespective of teaching methodology.

5.      The second reason for R.S.'s lack of success at school relates to his

emotional condition.  Rather than acting on the information available to regarding

the impact of R.S.'s documented emotional disability and its interference with his

school progress, by providing R.S. with specially designed instruction and

accommodations as is mandated by the IDEA, The Rehabilitation Act of 1973, the

ADA and related laws, the School District continually and consistently treated

R.S. primarily as a disciplinary problem, punishing him for disruptive behaviors

that were clearly manifestations of his disability.  Year after year R.S. was made

to serve detentions and suspensions from school.  Rather than remediating his

disability, this treatment exacerbated its impact on his performance in school, and

caused both R.S. and his mother K.S. significant unnecessary mental anguish.

6.      Over time R.S. came to believe the "messages" that he was

receiving from adults in school, that he could not learn to read, that his most

reliable means of attracting the attention was through punishments rather than

rewards and that he was never going to be successful in life.

7.      The years of active and passive neglect and indifference to his

need for specialized instruction and accommodations have permanently

diminished R.S.'s potential for success in life by any measure.  At seventeen years

of age, with no history of success in school until extremely recently, and few study skills, R.S. does not have the same potential to learn as he did as a younger child.  Although, as discussed below, he is now attending a private school for children with disabilities where, for the first time he is receiving individualized instruction including reading instruction from a skilled specialist using a reading program proven effective for learning disabled adolescents, R.S. cannot aspire to the same level of literacy as would have been the case had he received specialized instruction in his formative years.  Having attained the age of sixteen without being able to read a schoolbook or a newspaper, he has no foundation of knowledge or learning skills upon which to build a future career or attend a vocational skill.  As such, R.S.'s earning potential and potential standard of living for the foreseeable future is significantly less than what would be expected of a young man of his intelligence and less than it would have been had he learned to read, write and study as a young student.  R.S. cannot recover from the years of academic deprivation he has experienced.

8.     Each of the individual defendants had actual or constructive knowledge that R.S. failed to make meaningful educational progress.

## JURISDICTION

9.     Plaintiff brings this Complaint seeking relief for denial of rights to due process, equal protection, and equal access to education pursuant to the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, the Civil Rights Act of 1871, 42 U.S.C. §1983; the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §1400 *et .seq.* ;section 504 of the

Rehabilitation Act of 1973, 29 U.S.C. §794 ("Section 504"); the Americans with

Disabilities Act of 1990, 42 U.S. C. §12101 (the "ADA") and Pennsylvania's

implementing statutes and regulations with respect to the above federal Chapters

(22 Pa. Code Chapters 14 and 15; and former Chapter 342 of the standards of the

Pennsylvania Department of Education).  This Court has jurisdiction pursuant to

28 U.S.C § 1331 and §1343 (1) and (3), and by virtue of Pendant Jurisdiction over

the remaining claims.

10.    Venue is proper in this District pursuant to 28 U.S.C. §139(b)

because it was in the District that defendants contacted plaintiff and in which a

substantial part of the events or omissions giving rise to the claims herein

occurred.

## PARTIES TO THE ACTION

11.    Plaintiff R.S. is a seventeen-year-old boy who has at all times

material hereto resided with his mother K.S. in the City and County of

Philadelphia, in the Commonwealth of Pennsylvania.  R.S. suffers from learning

and emotional disabilities.

12.    Plaintiff K.S. is the mother of plaintiff R.S.  K.S. has at all times

material hereto resided with RS in the City and County of Philadelphia, in the

Commonwealth of Pennsylvania.

13.    Defendant Philadelphia School District  (the "School District") is a

School District of the First Class existing under and pursuant to the Public School

Code of the Commonwealth of Pennsylvania, 24 P.S.§ 1-100 *et. seq*., with a

principle place of business located at 440 North Broad Street, Philadelphia, PA

19130.  The School District is a Local Education Agency within the meaning of the IDEA.  Defendant District, as a recipient of federal funds under IDEA and other federal financial programs, is prohibited from discrimination against individuals with disabilities and is responsible for affirmatively making reasonable accommodations and providing benefits to students with disabilities that are as effective as those provided to non-disabled students.

14.     Defendant Philadelphia School Reform Commission ("the PSRC") is the successor entity to the Philadelphia School Board, consisting of members appointed pursuant to a Letter of Understanding entered into by the Governor of the Commonwealth of Pennsylvania and the Mayor of Philadelphia on or about December 21, 2001.  The PSRC is responsible for all policies of the School District and for compliance with all federal and state laws and regulations.

15.     Defendant Paul G. Vallas has been the Chief Executive Officer of the School District of Philadelphia from on or about July, 2002 through the current time.  As such he is responsible for the training and supervision of all School District employees and for ensuring that all School District students received a free and appropriate public education.

16.     Defendant David Hornbeck was Superintendent of the School District of Philadelphia from on about July 1996 through June 2002.  During this period he was responsible for the training and supervision of all School District employees and for ensuring that all School District students received a free and appropriate public education.

ADMINISTRATIVE EXHAUSTION

17.     No exhaustion is required as this is an action for monetary

damages only.  Such relief is not available in administrative hearings pursuant to

the IDEA and other applicable state and federal statutes and regulation.  *WEB v.*

*Matula*, 67 F.  3d 484, 495-96 (1995).  In addition the plaintiff has exhausted his

administrative remedies by virtue of the conclusion of a Due Process Hearing held

on June 10th and 21st 2004 in this matter, File Number 3832/03-04, and which was

the subject of an Appeal decided by the Pennsylvania Special Education Appeals

Panel on August 27, 2004. *See*, *In Re The Educational Assignment of R.S., A*

*Student In The School District of Philadelphia, Special Education No.  1517*.

Finally, the extensive history of defendants' failure to provide appropriate

instruction and accommodations has left R.S. in a condition in which

administrative remedies would be futile and ineffective.

**FACTS**

Failure to Identify and Program for
R.S.'s Learning and Emotional Disabilities

18.     Plaintiff R.S. is a seventeen-year-old boy of average cognitive

ability (intelligence) but who suffers from both learning and emotional disabilities

that interfere with his ability to make progress in school  His learning disabilities

include very significant deficits in decoding, phonemic awareness, sight

vocabulary, and comprehension.  This means, among other things, that R.S. has

difficulty with the mental process of breaking spoken words into their component

sounds and then associating those sounds with combinations of written letters.  As

8

a consequence of this, R.S. requires specialized instruction in order to learn to read.

19.     R.S. also suffers from medical and emotional disabilities that dramatically impede his progress in school.  Since he was a very young child, he has been diagnosed with Attention Deficit Hyperactivity Disorder, Oppositional Defiant Disorder, and while still in elementary school, clinical Depression.  In R.S.'s case, these illnesses consistently manifested themselves in school in an abnormal inability to focus on his school work, follow the instructions of teachers and socialize successfully with his peers.

20.     The federal and state statutes and regulations under which this Complaint is brought, require public school districts to identify children such as R.S. who suffer from learning or emotional disabilities that interfere with their ability to make meaningful progress in school relative to their individual potential. Once identified, the school district is required to implement appropriately individualized instruction and educational placements so as to enable the child to make meaningful educational progress academically and socially.  The School District failed for years to identify R.S.'s disability.  Once identified, the School District failed to program appropriately for his school related needs.  The educational history of R.S. with the School District is at best one of intentional disregard to the laws governing the entitlement of disabled children such as R.S. to specialized instruction.

21.     From almost the very beginning of his educational career with the School District, it should have been overwhelmingly apparently to the School

District staff that R.S. was in need of evaluations to determine his need for specialized services.

22.     In the winter of 1996, while still a first grade student at the Sheridan Elementary School, R.S. could not be controlled by his teacher.  In the months of January and February alone, he received sixteen disciplinary slips, an extremely high number for any age student, let alone a first grader.  On a January 31, 1996 disciplinary slip issued to R.S., his teacher reported that he that he "[w]ill not write, will not come into reading group, hides in closet…"

23.     The month before, his teacher wrote on a discipline slip that she had "[r]eferred [R.S.] to Special Ed."  On February 5, 1996 she wrote that R.S. "is thoroughly frustrated in this room.  He functions on Kindergarten level…His behavior of constantly disobeying is very disruptive."  By February 29, 1996 his teacher had apparently reached her breaking point.  On yet another disciplinary slip she wrote, "Please consider my resignation if [R.S.] is permitted to remain in the classroom."

24.     The School District failed to follow-up on R.S.'s teacher's threat to quit over his behavior and her referral of R.S. for a determination of his need for special education services.  What the School District did do, is furnish R.S. with a report card with a failing grade in almost every subject and require him to repeat the first grade.

25.     R.S. made no progress academically or socially during his second stint as a first grader at the Sheridan Elementary School, nor did he have the benefit of an evaluation for eligibility for special services or supports.  He

received numerous disciplinary slips over the course of the year and a final grade of "failing" in nearly every category measured by the School District.  This time however, the School District promoted him to the second grade for the 1997-1998 school year.

26.     R.S. continued to struggle academically and behaviorally as a second grader.  On February 19, 1998 approximately half-way through the school year, his teacher referred him again for special education consideration.  Once again, the School District neither evaluated R.S. nor implemented any accommodations or specially designed instruction for him in the classroom.  As he had done for the previous two years, R.S. again failed nearly every subject on his final report card.

27.      While R.S. was failing at school, his mother K.S. was pursuing help for him from the public mental health system.  On July 14, 1998, during the summer of the 1997-1998 school year, R.S. was diagnosed by the Child Psychiatric Center in Philadelphia with emotional/developmental and learning disorders.  K.S. shared the Center's evaluation report with the School District at the start of R.S.'s third grade year in September of 1998.

28.     There is in R.S.'s school file a form dated October 8, 1998, entitled "Student Referral for Learning Adjustment Needs" which recommends interventions for R.S.'s  academic and behavioral difficulties.  There is no indication, however, that any such interventions were ever implemented during the 1998 school year.

29.     R.S.'s report cards for the third grade indicated that he was experiencing difficulty in all subjects, easily distracted, continually leaving the classroom without permission and making no apparent efforts to improve his grades – which were in the failing range for the fourth year in a row.  R.S.'s disciplinary record reveals that he was suspended from school for forty-two days in the third grade.  That is almost one quarter of the school year.

30.     R.S.'s final report card in June of 1999 recorded failing grades in nearly all subjects and stated that, "[R.S.] did not meet the promotion requirements but because of his age he will be assigned to the next grade."

31.     R.S.'s school records indicate that at the end of his third grade year, in the spring of 1999 he was, for the first time, evaluated by a multidisciplinary team to determine his eligibility for an Individualized Education Program ("IEP") pursuant to the Individuals with Disabilities Education Act.  The resulting evaluation report, dated June 6, 1999 confirmed that R.S. was of average cognitive ability and concluded that he was *not* disabled.

32.     A review of the evaluation methodology utilized by the School District reveals that it was not reasonably designed to determine if R.S. met the requirements of a Learning Disabled student.  The conclusion that R.S. did not qualify as Emotionally Disabled or as "Other Health Impaired" under the IDEA was contrary to the School District's own data.  Nevertheless, the IEP Team followed the finding of the ER, and found R.S. ineligible for either an IEP or a Service Plan under §504 of the Rehabilitation Act.

33.     R.S. thus returned to Sheridan Elementary School. In September of 1999 as a regular education student, having failed each of the previous four years of school, the first grade twice, and second and third grades once.

34.     During this period K.S. continued to look for help for R.S. from the county mental health system. In June of 1998 she obtained a diagnosis of Attention Deficit Disorder (a recognized disability category under the IDEA) and shared the evaluation report with the School District.  In September of 1999, she also shared with the School District a September 20, 1999 report by R.S.'s mental health services provider, Northwestern Human Services which included a psychiatric diagnosis for R.S. of ADHD, Oppositional Defiant Disorder and Major Depression.  It also reported that R.S. had a learning Disability.  Still, the School District did not reconsider its conclusion that R.S. was non-exceptional, even to the extent of requesting permission to contact his mental health providers or conduct a reevaluation.  The School District did however agree to the request of his psychiatrist that the school nurse administer three different psychotropic medications to R.S. during the school day.

35.     R.S. continued to fail at school as a fourth grader during the fall of the 1999 school year.  His mother K.S. requested a Prehearing Conference with the School District, seeking that R.S. be reevaluated to determine his eligibility for specialized services.  The School District ultimately acceded to her request. On March 10, 2000 the School District issued a new Evaluation Report, which concluded that her son qualified for services pursuant to the IDEA as an emotionally disturbed and learning disabled student.  By this time, R.S. had

received grades of "F" in all behavioral and academic subjects for the first and second marking periods of the school year.

36.     The evaluation, although recognizing R.S.'s emotional disability as relevant to his performance in school, did little to address his behavioral problems that were the most apparent manifestation of that disability.  The Evaluation Report did not include a Functional Behavioral Assessment, which pursuant to the IDEA and its implementing Regulations, is critical to the understanding of the genesis of behavioral problems at serves as the basis upon which to write a plan for use in modifying a child's behavior in the school setting.

37.     R.S. finally obtained his first IEP from the School District on March 24, 2000, with approximately ten weeks of school remaining in his fourth grade year.  It proved to be more form than substance.  The initial IEP and all of those that that followed it annually for four years were patently defective by the standards of the IDEA.  Missing from the IEPs were proper statements of present academic levels, meaningful and measurable short-term educational objectives whether academic, social or emotional, appropriate related services such as school-based counseling, appropriately individualized specially designed instruction, scientifically designed behavior modification plans and proper transition planning for life following school.  These defects materially contributed to the failure of R.S. to make meaningful progress in school from the time of his first IEP through the conclusion of the 2003-2004 school year.  A partial list of the individual IEP defects includes the following:

a.   A May 21, 2001 IEP for implementation primarily when R.S. was in the 6th grade that stated his reading ability to be at a third grade level.  In fact, until at least the fall of 2004, R.S. was virtually a non-reader, "reading" only at a primer (pre-first grade) level.  Misstating R.S.'s levels of performance rendered meaningless the language arts related goals and objectives in his IEP and made it impossible to measure any progress or lack of it towards such goals and objectives.  Such measurements were evidently never intended by the School District, as the IEP was devoid of any goals relating to reading comprehension or writing.

b.   A June 18, 2002 IEP for the 7th grade failed to state R.S.'s present performance levels in any academic area.  Like its predecessors, it too lacked any behavioral goals or a behavioral support plan, even though R.S. continued to struggle mightily with his behavior in school.  The IEP was also written without the participation of the parent K.S.

c.   An October 2, 2002 IEP for implementation in the 8th grade that again failed to state R.S.'s present educational levels, making it impossible to assess his progress, if any.  The IEP again lacked measurable goals as well as appropriate specially designed instruction.  This IEP did not even include reading "decoding" goals and objectives, which are routine in an IEP for a reading disabled student such as R.S.  The document was also the product of an illegally constituted IEP Team Meeting.  The IEP team included neither a special nor a regular education teacher and no School district employee in the role of the local education agency representative.

  d. A December 18, 2003 IEP written in the fall of R.S.'s 9th grade year contained all of the defects of the document that preceded it.  Moreover, it was the product of a meeting that R.S.'s parent, K.S. was never invited to attend.  School District personnel handed an "Invitation to Participate" to R.S.'s uncle when he dropped-off R.S. at school and conducted the meeting that same day, without his mother's knowledge.

  e. An April 24, 2004 IEP for implementation primarily in R.S.'s 10th grade year was much the same, lacking meaningful and measurable academic, social and emotional goals and objectives as well as meaningful specially designed instruction.

  38. On April 23, 2004, R.S.'s mother K.S. requested a Special Education Due Process Hearing in order to address R.S.'s educational programming and his entitlement to Compensatory Services from the School District.  At a Special Education Due Process Hearing held on June 10 and 21, 2004 the School District stipulated on the record that it had not provided FAPE to R.S. from the time he had been evaluated in March of 2000 until the end of the school year 2003-2004.

  39. Hearing Officer David Bateman found that the School District failed to provide FAPE to R.S. from March 2000 until June of 2004 and failed to identify R.S. when they should have known he was an eligible child by at least June of 1998.  The Hearing Officer, applying a two year limitation period on compensatory education rewards pursuant to Montour School District v. S.T., 804 A.2d 29 (Pa. Cmwlth. 2002), limited the compensatory education award to R.S. to

two years or 1800 hours of compensatory education for this failure to provide FAPE.

40.     K.S. appealed this limitation to a Pennsylvania Special Education Appeals Panel.  The Panel reversed the Hearing Officer's application of <u>Montour</u> and awarded R.S. compensatory education not only for the four years in which the School District had stipulated it had denied FAPE to R.S., but also for the two additional years in which the District should have identified R.S. as an eligible child pursuant to the IDEA but failed to do so.  <u>In Re The Educational Assignment of R.S., A Student In</u> <u>The School District of Philadelphia</u>, Opinion No. 1517.  Thus, the Panel awarded R.S. six years of compensatory education representing the period of September of 1998 to June of 2004.

41.     Today, R.S.'s potential to develop academic skills is less than what it was as a younger child when he was developmentally receptive to specialized instruction.  Having failed to make meaningful progress in school for almost his entire life, R.S. was has not been able to build upon his learning experiences as children routinely do in order to acquire new skills and a fuller understanding of the world.  Although in the most recent school year he has made meaningful gains in basic skills such as the ability to read a menu or a medicine container, even with appropriate instruction at this point forward, he cannot be expected to regain all of the ground that he has lost by virtue of, for example, not being able to read a magazine or newspaper article.  R.S.'s educational potential and ability to lead a full life has not been merely delayed, it has been permanently diminished.

42.     R.S.'s ability to earn income as an adult also has been similarly diminished by the District's failure to program for him appropriately at a time when he was developmentally receptive to specialized instruction.  Although of average intelligence, he lacks the skills necessary to earn an income typical of that of an individual of his cognitive ability.  Even with appropriately individualized instruction form this point forward, R.S. will not be able to learn work related skills with the proficiency that he would have been able had his formative years not been wasted.

43.     As a consequence of the School District's failure to program for R.S.'s academic and emotional disabilities R.S. has suffered significant and lasting emotional harm.  As would be expected of a teenager who has hardly ever experienced success in school, he lacks the self-esteem and self confidence necessary to undertake new challenges that would enable him to advance his position in life.

## CAUSES OF ACTION

## COUNT I

### Individuals with Disabilities Education Act and Pennsylvania Implementing Statutes and Regulations
All Defendants

44.     Paragraphs 1 through 43 are incorporated by reference as if fully set forth below.

45.     Defendants failed to offer R.S. a free and appropriate public education as learning, emotionally and physically disabled child.  The School District

18

and individual defendants thereby violated the IDEA, and its implementing regulations in C.F. R. Part 300 and in the corresponding state statutes and regulations including 22 Pa. Code Chapters 14, and former Chapter 342, and Chapter 14 of the Pennsylvania State Board of Education Regulations.

## COUNT II

<u>Section 504 of the Rehabilitation Act of 1973 and</u>
<u>Pennsylvania Implementing Statutes and Regulations</u>
All Defendants

46.     Paragraphs 1 through 45 are incorporated by reference as if fully set forth below.

47.     Section 504 of the Rehabilitation Act of 1973, as amended, protects persons with handicapping conditions from discrimination or denial of services by programs receiving Federal funds. 29 U.S.C. § 794(a).  In order to receive federal funds, states must assure that they provide a free appropriate public education to all handicapped students within the state.  20 U.S.C. §1412.

48.     R.S. is a handicapped person as defined in 29 U.S.C. § 706(8).

49.     He is "otherwise qualified" for the educational programs provided by defendants.

50.     Defendants receive Federal financial assistance for their educational program.

51.     Defendants' conduct constitutes a violation of R.S.'s rights under 29 U.S.C. §794 and discrimination against R.S. on the basis of his disability. Defendant's conduct is also in violation of Pennsylvania's §504 implementing statutes and regulations including 22 Pa. Code Chapters 15 and former Chapter 342, and Chapter 15 of the Pennsylvania State Board of Education Regulations.

**COUNT III**

<u>Equal Protection Clause; Section 1983</u>
All Defendants

52.     Paragraphs 1 through 51 are incorporated by reference as if fully set forth below.

53.     As a proximate and direct result of the acts and omissions of each defendant, including their agents and employees acting in their official capacity under color of law, each defendant has deprived R.S. of his right to a free appropriate education in the least restrictive environment, in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. §1983.

54.     The School District has a policy or custom. of engaging in the unconstitutional activities complained of and the actions taken by its staff were the product of the official policy or customary behavior by the School District.

55.

**COUNT IV**

<u>Violation of the ADA</u>
All Defendants

56.     Paragraphs 1 through 54 are incorporated by reference as if fully set forth below.

57.     Defendants, by their aforestated actions, have engaged in disability discrimination and harassment and deprived R.S. of his  rights under the Americans with Disabilities Act of 1990, 42 U.S. C. §12101.

**COUNT V**

Violation of Federally Protected Rights; Section 1983
Defendant PSRC and School District of Philadelphia

58.    Paragraphs 1 through 56 are incorporated by reference as if fully set forth below.

59.    Each defendant, including their agents and employees, acting in their official capacities under color of law, through their non-compliance with the IDEA and Section 504, have individually, jointly and severally deprived R.S. of federally protected rights, including his right to a free appropriated education in the least restrictive environment and to equal protection under the law, rendering defendants liable under 42 U.S.C. §1983.

60.    The School District has a policy or custom of engaging in the unlawful activities complained of and the actins taken by its staff were the product or official policy or represented customary behavior by the School District.

**RELIEF REQUESTED**

**WHEREFORE**, plaintiff demands judgment against defendants, individually, jointly and severally, and respectfully request that this Court:

1.    Assume jurisdiction of this case;
2.    Issue a declaratory judgment that defendants have violated federal and state laws and the United States Constitution as outlined above;
3.    Award plaintiff compensatory damages against all defendants and punitive damages against the individual defendants;

4.      Award plaintiff his costs and attorneys fees incurred in the prosecution of this lawsuit pursuant to 20 U.S.C. §1415 and 42 U.S.C. §1988 and pre-judgment and post-judgment interest; and

5.      Award any additional relief as may be just, proper and equitable under the circumstances.

Dated: June 28, 2005

_____
Law Offices of David S. Thalheimer
David S. Thalheimer, Esq.
Attorney for Plaintiff

Identification No. 50367
1831 Chestnut ST
Suite 300
Philadelphia, PA  19103
215-568-5656